UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEVIN GARDNER, | ) | CASE NO. 5:15CV1270 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| SUMMIT COUNTY EDUCATIONAL | ) | **ORDER AND DECISION** |
| SERVICE CENTER, *et al.*, | ) | (Resolving Docs. 22 and 38) |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on a motion for summary judgment filed by Defendants Summit County Educational Service Center and Summit County Educational Service Center Governing Board (collectively "the Board").  Doc. 38. The Court finds that no genuine issues of material fact exist as to Plaintiff Devin Gardner's claims set forth in his Amended Complaint. As such, for the following reasons, the Board is entitled to judgment as a matter of law, and its motion for summary judgment is GRANTED.  The Board also filed a motion for judgment on the pleadings.  Doc. 22.  Given the Court's ruling on the motion for summary judgment, the motion for judgment on the pleadings is DENIED as moot.

## I.      FACTS AND PROCEDURAL HISTORY

### A.   Summit County Educational Service Center

The  Board  is  a  state-funded  organization  that  "'offers  programs  for  curriculum, curriculum development, professional development, special education, as well as direct programs for students with disabilities'" for its member school districts.  Doc. 38 at 2 (*quoting* Doc. 40 at

1

13-14).  The Board employs teachers directly and then places them into member schools.  Doc. 40 at 14.  The school district decides whether the district or the Board will supervise and evaluate the teacher.  Doc. 40 at 15.  Every year, district officials meet with the Board to discuss "…the programs that are offered to the district, if the district will continue to participate, and then any staff issues."  Doc. 40 at 16.  After these conversations, the Board and the district are generally in agreement on whether a contract should be given to a certain teacher.  Doc. 40 at 16.  Based on these conversations, a teacher's contract would be renewed or non-renewed at the end of each academic year.  Doc. 40 at 17.  If a teacher was to be non-renewed, then the Board would send a letter of intent to non-renew the contract.  Doc. 40 at 17-18.

### B.   Plaintiff's work history for the Board

Plaintiff Devin Gardner was a teacher hired by the Board in 2009 as a long-term substitute in an intervention preschool classroom.  Doc. 9.  Gardner was later placed in a full-time position as a preschool teacher in the Tallmadge City School District for the 2009-2010 academic year.  Gardner's contract was for one year, and at the end of the school year, the Board's Preschool Coordinator, Kimberly Meeker, assigned Gardner to a different school district after "(1) [she] received multiple complaints from Tallmadge personnel that Gardner made repeated inappropriate physical contacts with his classroom aide…and (2) Gardner had interpersonal issues with a high school teacher from the Sixth District Compact.  The Compact operated a vocational program in which high school students who were interested in becoming teachers, were assigned to work in classrooms as part of their coursework.  Gardner's class was one of these classrooms in which high school students from the Compact were assigned."  Doc. 38-7.  The Compact teacher "repeatedly complained that Gardner was not prepared for class, did not prepare lesson plans, and was not using the approved curriculum…[and this] prevented her

2

students from aligning their activities and assignments from the vocational program with Gardner's classroom."  Doc. 38-7; Doc. 39-1 at 460-61 (Gardner testified, Q:  They wouldn't work with you?  A:  They didn't like my style, my teaching style.").  Gardner received evaluations for the 2009-2010 and 2010-2011 school years.  For example, the 2010-2011 Performance Appraisal notes:

- Behavior Management: "Although there was no evidence of inappropriate behaviors on the part of the student[,] I did not see evidence of clear expectations – What is the schedule – where are the students suppose[d] to be?  For how long?"

- Productivity:  "I did not see evidence of clearly defined activities for the students on this specific day, your assistant was out – SLD working with two students and you were at computer with one after SLD left[,] your response was 'OK – we are going to read a book[.]'  This didn't appear to be the plan….

  *Your involvement with students in their free choice play is your strength.  However, your overall classroom planning[,] tying in content with purpose is not evident.  This year you seem and appear to be distracted.  With purposeful planning comes continued higher level thinking questions, student planning etc…'"

- Language Modeling:  "Where are you with your parental contact and technology goals?"

Doc. 38-13.

Prior to the 2012-2013 school year, "[t]he Ohio Department of Education developed comprehensive new early learning and development standards…."  Doc. 38-11.  These standards placed an increased emphasis on lesson planning, communications with parents, and early learning assessments; and as a result, the Board hired Teresa Brown as an additional coordinator to "specifically assist with the lesson planning and learning assessment portions of these new standards."  Doc. 38-11.  "…Brown implemented a number of new policies and procedures for the preschool program.  Those policies included the submission of team, monthly, and weekly

3

lesson plans.  Teachers were required to upload these lesson plans into a Dropbox folder by the first Monday of each month, for team and monthly lesson plans, and the Monday of each week for the weekly lesson plans."  Doc. 38-11.  In response to the new standards, the Board also hired Joseph Petrarca in August of 2012 to serve as the Director of Student Services.

Various administrators reported that Gardner had some difficulty adjusting to the new policies and the administration.  Doc. 41 at 8-9 ("Devin was a dissatisfied employee as it relates to some, perhaps many requirements of being a preschool teacher in a special needs preschool setting….Devin seemed to me to be unable or unwilling to take the steps or make the changes in his conduct and performance that would lead him to having a more satisfying and successful and professional experience."); Doc. 42 at 11 ("He struggled with implementing the curriculum which was the main focus of my position during my first year.").[1]

Brown communicated "ongoing concerns" about Gardner to Petrarca in the fall of 2012.  Doc. 40 at 45-46.  These include Brown's concern that Gardner "…was not using the approved curriculum [by the Board]…[because] [h]e didn't like it."  Doc. 40 at 46.  She also reported concerns to Petrarca about Gardner's "[t]imeliness of mandated reporting, mandated individual education plans being done on time, getting his part completed for student evaluations and structure of his classroom."[2]  Doc. 40 at 46.  In fact, the record reflects that Brown identified

---

[1] *See also* Doc. 42 at 11 ("Sure.  When I was brought into the ESC [the Board], we were undergoing a lot of changes based on new requirements coming out of the Department of Education.  So I was brought in to really look at the curriculum instruction practices and how they will be implemented in the classroom.  So we put a lot of new policies and procedures in place, and Devin appeared to struggle with those new policies.").

[2] Q:  And what did she [Brown] convey to you [Petrarca] about her discussion with him [Gardner] about that?
A:  That she had directed [Gardner] to use the approved curriculum.
Q:  And did she tell you what his response was?
A:  Yes.
Q:  What did you understand that response to be?
A:  That he was not going to do it.
     * * *

4

Gardner as a candidate for a Plan of Assistance ("POA") in the fall of 2012.[3]  Doc. 38-1.

Throughout the fall semester of 2012, Brown sent various e-mails to Gardner regarding his

failure to timely submit lesson plans.  Kimberly Meeker, a Preschool Coordinator for the Board,

observed Gardner's class and completed his evaluation in December of 2012, noting:  "Devin

needs to begin to utilize our curriculum as the main framework for curriculum planning.

Submissions need to be placed in drop box, per the due date from Teresa [Brown].  Purposeful

---

Q: With respect to timeliness of mandated reporting and lesson plans in [Gardner's] part of the student evaluation, did she give you particular instances or tell you any details about how late he was or what the circumstances were?
A:  She did.
Q: Can you tell us what those were?
A: There was an instance in the fall where an IEP [individualized education program] was supposed to be completed by a certain time and he had missed the deadline.
        *  *  *
Q: And what did you understand to be the concerns about the structure of his classroom?
A: There is a certain way that preschool classrooms are to be set up and his appeared to be disorganized.

Doc. 40 at 47-49.

[3] Teresa Brown, the Board's Preschool Coordinator, testified:

> During the fall semester of 2012-13 school year, [Brown] met with MaryKay Misterka ("Misterka"), the Special Services Supervisor for the [Stow-Munroe Falls City School] District, to inquire how the preschool program was operating from the District's perspective and what [Brown] could do to support the preschool teachers so that they were successful.
>
>> a.  During this meeting, Misterka communicated her issues with Gardner, which included issues of timeliness and the accurate completion of paperwork. Misterka specifically stated that, if [Brown] could improve Gardner's performance, it would go a long way towards the Board operating a successful preschool program.
>> b.  During the fall of the 2012-2013 school year, [Brown] communicated to Misterka that [Brown] intended to place Gardner on a formal plan of assistance due to Gardner's continued performance issues – i.e., completion of paperwork and timeliness.  [Brown] required that Misterka provide input as to specific areas that the District wanted Gardner to improve in.
>> c.  Misterka provided input regarding timeliness, accurate data collection, organization, accurate completion of paperwork, bringing paperwork to meetings, and improved communications with parents and staff.

Doc. 38-1; *see also* Doc. 38-8.

5

planning needs to be demonstrated on his part.  Bi-weekly check-ins may be implemented if need be."  Doc. 38-7.

### C.  Gardner's surgery and resulting leave of absence

On February 7, 2013, Gardner underwent prescheduled wrist reconstruction surgery.  At the time, Gardner believed he would be recovering for two to three weeks.  Doc. 39 at 100.  It is undisputed that he did not provide the Board with 30-days' notice of the surgery, and Gardner does not dispute that it was possible to have provided 30-days' notice.  Instead, Gardner prepared a binder with three-weeks of lesson plans and spoke to the Board secretary to arrange a substitute.  Doc. 39 at 103-104.  He mentioned his absence to Brown and Petrarca but never communicated his absence to Human Resources.  Gardner later admitted that he "…should have gone straight to human resources."  Doc. 39 at 128.

On February 19, 2012, Gardner's physician provided him a "workability" form allowing Gardner to return to work, with restrictions.  Doc. 38-52.  He returned to work on February 25 and worked a half day on February 26, 2013.  Doc. 38-56.  Around this time, Gardner informed Petrarca that his recovery had complications and that he was going to need a two-month absence from work.  Petrarca made the suggestion that Gardner could "work in the office" to "save sick days" since Gardner was concerned about losing money through his absence.  Doc. 39 at 217 ("Q:  He offered it [working in the office to save sick days] to you?  A:  He [Petrarca] offered it to me and I [Gardner] said okay.  If I can save some sick days, whatever, I'll try it.").  Gardner tried working in the office but felt the work was too physically tasking for his wrist, and his doctor provided a workability form that required his absence from February 27 through March 1, 2013, authorizing his return on March 4 with restrictions.

6

On February 28, 2013, Melissa Habowski, Human Resources Director for the Board, called and left a message for Gardner because she "…became aware of the need to contact [him] because he had been out for surgery." Doc. 41 at 49. When she spoke with Gardner on March 1, 2013, the two were able to develop a plan that permitted Gardner to perform light-duty work and utilize paid leave when necessary to allow Gardner to avoid entering unpaid status.[4] Doc. 39 at 123-25; Doc. 41 at 51 ("[Habowski] characterized that as a reflection of Devin's concern that he not go into unpaid status.").

Gardner performed light-duty work and utilized his sick leave in accordance with the plan from March 4 through April 2, 2013. It became clear that he needed to do no work at all in order to aid in his recovery, and Habowski determined that he would need to be placed on FMLA leave. Doc. 41 at 58 ("So we made a very sincere effort to accommodate both Devin's release to return-to-work, his desire to return to work because he was concerned about running out of paid sick time. And when it became clear that he needed to not do any kind of work to aid his recovery, at that point, [Habowski] determined we would put him on FMLA leave."). Gardner was considered on FMLA from April 3-12, 2013. While on FMLA leave, he received four work-related requests, where he was asked: 1) to complete a portion of an IEP; 2) to provide the

---

[4] Q: And I think this is what you're [Gardner] referring to as you came up with a plan that would allow you to get paid and use your sick leave?

A: To use the remainder of my sick days and emergency days.

Q: So that you could –

A: So that I would be able to be paid during part of that leave which is what they had told me originally that part of it is paid and part of it is not paid.

     * * *

Q: The e-mail you responded to said this looks like it works out very well.

A: Okay, right. It looks like it will work out well….

Doc. 39 at 123-25.

location of "specific paperwork that was in [his] classroom;" 3) to disclose the location of a student's "EMIS [data]sheet;" and 4) to provide a copy of "a data notebook that the nurse needed for a young student who [Gardner] had in [his] classroom who had seizures," which Gardner did not recall responding to this last request.  Doc. 39 at 261-65.

### D.  Gardner's performance following his return to work

Within a "couple of weeks of coming back," from FMLA leave, Petrarca and Brown informally told Gardner that they would place him on a POA.  Doc. 39-1 at 277.  A POA "is designed to assist teachers in their craft" and is typically provided at the end of a school year. Doc. 40 at 90.  On April 28, 2013, Brown forwarded Gardner an e-mail from Dr. Saternow, the Director of Student Services for Stow-Munroe Falls School District, requesting information regarding extended school year services ("ESY").  Doc. 38-57.  Gardner did not respond to Dr. Saternow.  The next day, Brown sent a second e-mail directing Gardner to "followup with Marty ASAP."  Doc. 38-57.  Gardner responded the following day, but Dr. Saternow requested additional information.  Doc. 38-57.  Then, on May 7, 2013, Dr. Saternow sent Gardner another e-mail stating "I still have not received any response from you…it has been 7 days since you indicated that you would get something to me."  Doc. 38-57.  Brown followed up with an e-mail that read:

> Devin,
>
> I am following up on the phone conversation that we just had in which I asked you to check your email and respond to Dr. Marty's request for ESY documentation immediately.  I just received another email from Marty (since we talked) stating that she has not heard from you and she stopped by your classroom this morning but you were not there.  I would like this situation taken care of no later than tomorrow (5/8/2013).  **Failure to comply with this request will result in further disciplinary action.** Further, I would like you to get into the habit of regularly checking your

> email and responding to requests.  I would also like you to copy me on any
> correspondence with the Stow representatives.

Doc. 38-57 (emphasis added).  Gardner did not respond by the deadline.  Brown sent another e-mail that read:

> Devin,
>
> Did you follow up with Marty yet?  I received an email from her this afternoon stating that she still has not heard from you[.]  I thought I made it very clear that you needed to respond to her yesterday?  **This is urgent if you want your students to receive ESY services.**  Please respond to her ASAP.  **Your lack of responsiveness to district requests is very disappointing and will not be tolerated.**

Doc. 38-57 (emphasis added).

On May 17, 2013, Kimberly Misterka (Stow's Special Services Supervisor) sent Brown an e-mail with the subject "Devin is not here."  Doc. 38-22.  Misterka's e-mail continued: "He has all the copies of etr [evaluation team reports] iep.  It's 1030.  We were[] supposed to start at 1015.  We r sitting here w mom waiting. ;( "  Doc.38-22.  Brown forwarded the e-mail to Gardner with the message:  "What is this all about? I thought we just had a conversation earlier this week about getting organized and having things ready for meetings?  Let me know if I was not clear about our expectations."  Doc. 38-22.

On May 21, 2013, Dr. Saternow from Stow sent another e-mail to Brown stating "there is no district rep signature on this iep. This is a required team member….It is Devin's responsibility to assure that all 'required' team members are present!" Doc. 38-23.  Without the signature, the IEP was not compliant with the requirements of the Ohio Department of Education.  Doc. 38-23.

Ten days later, the Board formally placed Gardner on a POA, in which Petrarca, Brown, and Habowski had input.   The POA specifically documented deficiencies in Gardner's

performance and the dates in 2012 and 2013 in which Brown had sent e-mails and had meetings with Gardner to discuss his performance issues.  The POA notes that these deficiencies remained including: 1) lack of completion and deficiencies in lesson planning; 2) lack of follow through with requests from the district and Board administration and not being prepared for IEP/ETR meetings; and 3) not having a district representative at an IEP meeting.  Doc. 38-24.  The POA then directs Gardner to meet monthly with the administration, submit ETRs and IEPs three days in advance, and respond to all e-mails within one day of receipt.  Doc. 38-24.

Pursuant to the POA, Gardner met with Brown on a monthly basis during the fall of 2013.  However, according to Petrarca's Progress Summary memo to Gardner in February of 2014, the Board did not feel that Gardner was progressing with the plan.  Doc. 38-45.

> The purpose of this memo is to document your [Gardner's] progress to date with your action plan. At the start of the school year, and as part of your action plan, you met with the program coordinator, Teresa Brown, on a monthly basis to monitor the action items outlined in your plan. Given your lack of progress by your December meeting, it was determined that you and I [Petrarca] would meet on a weekly basis beginning in January when we returned from winter break. At that time you were asked to reflect on the reason(s) why you were not progressing with your plan.

Doc. 38-45.  The Progress Summary continues to describe the events of every weekly meeting with Petrarca beginning January 10, 2014 through the date of the memo.  The meeting summaries document that Gardner appeared 10-15 minutes late to several meetings with Petrarca, failed to implement organizational strategies such as creation of lists and folders for Outlook Express e-mail system, failing to be "fully prepared" in an IEP meeting with Brown, the team, and parents, failing to provide Brown with copies of any evaluation team reports (ETRs) or IEPs three days in advance as outlined in the POA, and failing to provide names to the Stow school district of students transitioning to kindergarten since they might need additional

10

assistance.  Doc. 38-45.  The summary also notes that Gardner was late in responding to e-mails and in providing information requested by the Stow school district.  Doc. 38-45; *see also* Doc. 38-44.  Petrarca also explains to Gardner in his Progress Summary that the Stow district's special education leadership met and several of the parents in Gardner's room, "while they like [Gardner] personally, have been upset with the lack of timely communication…These parents have requested, through the district, that their children not be placed with you for the following school year."  Doc. 38-45.  Petrarca ends the memo by stating:

> Your lack of attention to detail, following mandated timelines and adherence to your Action Plan has jeopardized the Summit County Educational Service Center's [the Board's] relationship with the district as it relates to preschool operations.  At this point, the district is questioning whether the ESC [the Board] can operate a fully compliant preschool program.
>
> The incidents specified in this letter are serious deficiencies in your performance.  It is critical that for the time remaining in this school year that you make it a priority to adhere to all aspects of your Action Plan.  If you demonstrate and sustain adherence to your plan, including all mandated timelines, you may be reassigned to another classroom site for the 2014-15 school year.  Failure to meet these expectations may result in a recommendation for nonrenewal.

Doc. 38-45.

After the Progress Summary, Gardner had a conference to discuss his Teacher Evaluation score of "developing" (on a scale of "Ineffective, Developing, Skilled, Accomplished).  Doc. 38-47.  The Evaluation Rubric noted guidance such as: "There is little correlation between the plan submitted and what actually occurred during this lesson" and "Mr. Gardner welcomes communications from families but does not always respond in a timely manner."  Doc. 38-47.  The Evaluation Rubric also mentioned the lack of responsiveness, late development of IEPs, failure to meet deadlines, and parent concerns about communication.  Doc. 38-47.

Petrarca performed Gardner's Final Summative Rating of Teacher Effectiveness, and he rated Gardner as "Ineffective" for his final, overall rating.  Doc. 38-49.  Petrarca noted that the students did not meet Gardner's expectation of growth in cards for naming, vocabulary, and rhyming.  Doc. 38-49.  Petrarca noted that Gardner failed to "report 4 students during the critical interval of instruction.  He was late in submitting the date and did not resubmit date mid[-]year for review.  Refinement areas are to analyze data on a regular and consistent basis and to adhere to established time lines."  Doc. 38-49.

### E.  Non-renewal of Gardner's contract

Each teacher's contract with the Board was non-renewed at the end of each year as a matter of course.  Doc. 39-1 at 396.  On April 15, 2014, the Board sent a letter via certified mail to Gardner stating that the Board had voted to "non-renew" Gardner's employment contract at the end of the 2013-14 school year.  Doc. 38-48.  Petrarca testified that he delivered the letter to Gardner in person.  Gardner confirmed that received a copy of the letter at some time.  Doc. 39-1 at 396-98.   In late May, Petrarca and Brown met with Gardner to review his Final Summative Rating and evaluation, and they informed him that the Board would not be renewing his contract for the next school year.  Doc. 39-1 at 427.  Thereafter, Gardner filed an Amended Complaint alleging interference with FMLA, retaliation for using FMLA leave, equitable estoppel and promissory estoppel under FMLA, violation of notice requirements regarding the non-renewal of his teaching contract, and breach of contract.  Doc. 9.

## II.    LEGAL STANDARD OF REVIEW

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  A fact is material if it is one that might affect the outcome of the suit under governing law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens. *Id.* At 252. Further, on summary judgment, the inferences to be drawn from underlying facts must be viewed "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The pivotal question in deciding a motion for summary judgment is whether a reasonable fact finder *could* make a finding in favor of either party. *See Anderson* 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

The initial burden of showing the absence of any "genuine issue" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury" or other fact-finder at trial. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). A party opposing summary judgment must show that there are facts genuinely in dispute, and must do so by citing to the record. Fed.R.Civ.P. 56(c)(1)(a).

## III.    LEGAL ANALYSIS

### A.  Interference with FMLA

> To establish a claim for FMLA interference, a plaintiff must show that: (1)
> she was an eligible employee; (2) her employer was a covered employer; (3)
> she was entitled to leave under the FMLA; (4) she gave her employer notice
> of her intent to take leave; and (5) her employer denied her FMLA benefits
> or interfered with FMLA benefits or rights to which she was entitled.

*Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir.2003).

The right to non-interference with medical leave is not absolute. "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request." *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1262 (10th Cir.1998). An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave. *Id.*

Here, Gardner alleges that the Board interfered with his FMLA entitlement by: 1) failing to notify him that his surgery qualified for FMLA leave; and 2) improperly delaying FMLA leave.  Doc. 44. Gardner cannot create an issue of material fact on either argument because he failed to properly notify the Board about his surgery.  The statutes governing FMLA require that employees give 30 days' notice for foreseeable treatment of serious health conditions.  29 U.S.C. §2612(e)(2); *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (upholding dismissal where employee did not request leave).  Under the FMLA, "[a]n employee also may be required by an employer's policy to contact a specific individual." 29 C.F.R. § 825.302.   It is undisputed that Gardner provided no notice of his pre-planned surgery until two weeks prior to the procedure.  Furthermore, the Board requires that employees provide notice to the Human Resources Department directly when the "necessity for leave is foreseeable based on planned medical treatment."  Doc. 38-4.  Habowski, the Director of Human Resources testified:

> As part of [new employee] orientation, [Habowski] sat down individually with each employee and walked them through the employee handbook and the expectations of the Summit ESC [the Board].

The orientation included an explanation of the Family and Medical Leave Act…and instructions to contact [Habowski] if they experienced a qualifying event so that we could talk about eligibility and procedures.

**[Habowski] further explained that the usual and customary procedural requirement of the Summit ESC [the Board] is that the employee notify Human Resources…directly when the necessity for leave is foreseeable based on planned medical treatment. This policy is in place so that HR, which handles FMLA leave requests, can advise the employee whether the leave qualifies under the FMLA and what the employee's options may be.**

Doc. 38-4 (emphasis added).  Habowski further testified that she provided Gardner with his employee orientation, during which she explained FMLA leave and the Board's requirement that the employee contact HR directly for foreseeable leave.  Doc. 38-4.  Gardner not only failed to provide the statutory requirement of 30 days' notice of his pre-planned surgery, but he also failed to notify HR as required by the Board's policy.  Even Gardner acknowledges that "[t]he FMLA does allow an employer to 'condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances.'"  Doc. 44 (*quoting Srouder v. Dana Light Axles Mfg., LLC,* 725 F.3d 608, 614 (6th Cir. 2013) (*citing* 29 C.F.R. §825.302(d))).

In an effort to argue that he provided sufficient notice, Gardner points to the fact that he notified Petrarca and Brown of his original two- to three-week absence and arranged for a substitute teacher.  While he may have notified someone at the Board, he failed to notify the one department that was required.  In deposition, Gardner also acknowledged that he should have notified HR.  Doc. 39 at 128 ("Well, it turns out I shouldn't have talked to any of them [i.e., Brown and Petrarca], I should have gone straight to human resources.").

Gardner argues that the Board waived its notice requirements by granting his leave request.  "A plain reading of the amended language reveals that an employer may require

15

compliance with the employer's ordinary custom. Nothing in the regulation, however, suggests that an employee must adhere to an official written policy to provide sufficient notice under the FMLA when a different unwritten custom is typically followed.  *Festerman v. County of Wayne*, 611 Fed. Appx. 310, 316–17 (6th Cir. 2015).

In support of waiver, Gardner argues that teachers would input an absence into a computer system and that they would tell the secretary of an absence in order to secure a substitute teacher.  However, Gardner does not state that the Board allowed this process to be an alternative to giving notice to HR of a foreseeable absence.  Granting FMLA leave after HR finally learned of his absence does not evidence a waiver in any way.  Gardner cannot demonstrate an unwritten custom different from the established FMLA notice policy.

Lastly, the Court would note that the record establishes that Gardner wanted to take as little unpaid leave as possible.  The record also establishes that, after HR became aware of his surgery, he was offered FMLA as an option.  Gardner did not want to go into unpaid status, so the Board tried to accommodate his concerns by allowing him to do light work at the office instead of taking FMLA.  When it became clear that the light work was not helping his recovery and he had no more paid leave, Gardner took FMLA leave for the remainder of the time he needed to recover.

Even if the Board had waived its notice requirements in some way, Gardner was not prejudiced by not being offered FMLA leave prior to HR contacting him after the surgery.  *Kitts v. Gen. Tel. N., Inc.*, 2:04-CV-173, 2005 WL 2277438, at *9 (S.D. Ohio Sept. 19, 2005) (*citing See Jeremy v. Northwest Ohio Dev. Ctr.*, 33 F.Supp.2d 635, 639 (N.D.Ohio 1999)) ("An employer's failure to provide an employee adequate notice of FMLA rights may give rise to a

claim of interference, but only if such a failure causes Plaintiff to be denied benefits to which she was entitled.").

Given all of this, without proper notice of a potentially qualifying event, Gardner cannot demonstrate a genuine issue of material fact on his claim for interference with FMLA. *Crawford,* 531 Fed. Appx. at 625–26.

### B. FMLA Retaliation

Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). At the outset, "the plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." …One of the ways in which we have previously held that a plaintiff may make out a prima facie case is by showing that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity.

If the plaintiff satisfies her prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination. "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"

*Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) [internal citations omitted].

Gardner alleges that his placement on a POA and the Board's decision to non-renew his contract were adverse employment actions committed in retaliation for taking FMLA leave. In the interest of efficiency, the Court will not analyze whether Gardner has made a prima facie case of retaliation. Instead, the Court moves directly to the issue of whether the Board has

established evidence of a legitimate, non-discriminatory reason for the alleged adverse employment actions. The Court finds that there is no genuine issue of material fact that the Board had a legitimate, non-discriminatory reason for placing him on the POA and for ultimately non-renewing his contract.

The record demonstrates that the problems described in Gardner's final evaluation before non-renewal also existed in the fall of 2012 – well before Gardner notified anyone about his surgery the following February.  For example, in the fall of 2012, various supervisors and administrators noted Gardner struggled 1) using the curriculum stemming from new Department of Education standards, 2) with timeliness of mandated reporting, 3) with mandated IEPs being done on time and "getting his part completed for student evaluations," and 4) maintaining structure in his classroom.  Doc. 40 at 46; Doc. 38-7.  His evaluation in December of 2012 also reflected issues with curriculum planning, curriculum submissions being untimely, and noted that "purposeful planning needs to be demonstrated.  Biweekly check-ins may be implemented if need be."  Doc. 38-7.  The record reflects that he was identified as a candidate for a POA in the fall of 2012 prior to anyone being notified of Gardner's surgery or the months he would eventually need to recover.  Doc. 40-46.

Furthermore, the record reflects that the problems with Gardner's teaching, identified in the fall of 2012, persisted throughout the following school year of 2013-2014.  Gardner had approximately 18 months after being made aware of the issues needing improvement to make sufficient progress to avoid non-renewal.   Instead, the same concerns about Gardner's performance from the fall of 2012 persisted and were repeated (with opportunities to improve) throughout the spring semester of 2013 and throughout the entire school year of 2013-2014.  The evaluations and growth measures conducted in the spring of 2014 note that insufficient

improvement was made and that the relationship between Stow school district and the Board was then in jeopardy.  The Board's decision to non-renew Gardner's contract was based on legitimate, non-discriminatory reasons.

Gardner argues generally that the Board's reasons for the POA and non-renewal constitute a pretext.  However, as noted above, the same reasons that were identified for Gardner's non-renewal were recognized as required areas of improvement well before Gardner notified anyone of his surgery.  While it is undisputed that Gardner had effective interactions with students, the record is replete with evidence that Gardner's more "administrative" and planning duties were lacking and that the Board had demanded improvement before notice of his surgery.  There is no genuine issue of material fact as to legitimate, non-discriminatory reasons for employment action or pretext.  The Board is entitled to judgment as a matter of law on Gardner's claim for FMLA retaliation.

### C.  FMLA Estoppel

To establish an equitable claim for FMLA estoppel, Gardner must show "(1) a definite misrepresentation as to a material fact, (2) a reasonable reliance on the misrepresentation, and (3) a resulting detriment to the party reasonably relying on the misrepresentation." *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 557 (6th Cir. 2009).  Gardner does not identify a "representation" made the Board in his brief in opposition to summary judgment or in his brief in opposition to the motion for judgment on the pleadings (which Gardner incorporated by reference).  Instead, he generally restates his retaliation claims.  Since Gardner cannot point to a misrepresentation made by the Board, upon which he relied to his detriment, the Board is entitled to judgment as a matter of law.

### D.  Notice violation pursuant to Ohio Revised Code 3319.11

"A teacher is…entitled to receive written notice of the school district's intention not to reemploy on or before the thirtieth day of April or the teacher is presumed to be reemployed. It is the school district who has the burden of proving by a preponderance of the evidence that it gave notice in accordance with R.C. 3319.11." *Coleman v. E. Cleveland City Sch. Dist.*, 80122, 2002 WL 568188, at *2–3 (Ohio App. 8th Dist. Apr. 11, 2002), cause dismissed, 769 N.E.2d 872 (Ohio 2002) (*citing Zartman v. Lakota Local Sch. Dist. Bd. of Edn.* (1972), 33 Ohio Misc. 217, 219; *State ex rel. Gray v. Springfield City Sch. Dist. Bd. of Edn.* (Feb. 8, 1983), Clark App. 1713, unreported, 1983 Ohio App. Lexis 13325).

Ohio Revised Code 3319.11(H)(1) governs the manner in which a teacher is to receive notice and provides:

> In giving a teacher any notice required by division * * * (E) of this section, the board or the superintendent shall do either of the following:
>
> (a) Deliver the notice by personal service upon the teacher;
>
> (b) Deliver the notice by certified mail, return receipt requested, addressed to the teacher at the teacher's place of employment and deliver a copy of the notice by certified mail, return receipt requested, addressed to the teacher at the teacher's place of residence.

R.C.  3119.11(H)(1).  Consistent with this statutory requirement, Petrarca testified that he "delivered written notice by personal service on April 25, 2014" of the Board's intention to non-renew Gardner's contract.  Doc. 38-9.  Gardner has not pointed to a record citation where he denied receiving the letter from Petrarca on April 25, 2014.  As such, Gardner cannot demonstrate an issue of material fact on the claim for notice violations under R.C. 3119.11.

### E.  Breach of contract

As an initial matter, the Court would note that it appears to be undisputed that Gardner's employment contracts stated: "The Teacher specifically waives any right or entitlement to continuing contract status" and "The Teacher specifically waives any right or entitlement to continuing contract status pursuant to operation of R.C. 3319.08 or RC 3319.11."  Docs. 9-1, 9-2, 9-3, 9-4, 9-5.  What is more, even if Gardner had not waived any entitlement under R.C. 3319.08, Gardner was required under statute to have completed 30 hours of coursework in the area of licensure to be entitled to continuing contract status.  There is no evidence in the record that he completed this coursework.  Therefore, Gardner cannot demonstrate an issue of material fact on his claim for breach of contract.

## IV.    CONCLUSION

Reviewing the facts in a light most favorable to the Plaintiff Devin Gardner, no genuine dispute of material fact exists on any claim against Defendants. Therefore, the Defendants are entitled to judgment as a matter of law, and their motion for summary judgment is GRANTED. The Defendants' motion for judgment on the pleadings is DENIED as moot.

IT IS SO ORDERED.


Dated: 03/14/2017                         */s/John R. Adams*_____
                                          JOHN R. ADAMS
                                          UNITED STATES DISTRICT JUDGE